11 CIV 6285

Margot G. Bloom (MB-7455)
MORGAN, LEWIS & BOCKIUS LLP
Attorneys for Plaintiff
101 Park Avenue
New York, NY 10178-0061
Telephone: (215) 963-5122
Fax: (215) 963-5000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BL RESTAURANT OPERATIONS, LLC

        Plaintiff,

    v.

701 AMERICA, INC. (F/K/A BAR LOUIE AMERICA,
INC.), 706 DEVELOPMENT, INC (F/K/A BAR LOUIE
DEVELOPMENT, INC.), 100 TRADEMARK, INC.
(F/K/A BAR LOUIE TRADEMARK, INC.),
CONCEPTS AMERICA, INC., ROGER A.
GREENFIELD REVOCABLE TRUST,
ROGER A. GREENFIELD, AND THEODORE
KASEMIR.

        Defendants.



COMPLAINT

      Plaintiff BL Restaurant Operations, LLC ("BLRO"), by and through its attorneys,

Morgan, Lewis & Bockius LLP, for its Complaint against defendants 701 America, Inc. (F/K/A

Bar Louie America, Inc.), 706 Development, Inc. (F/K/A Bar Louie Development, Inc.), 100

Trademark, Inc. (F/K/A Bar Louie Trademark, Inc.), Concepts America, Inc., Roger A.

Greenfield Revocable Trust, Roger A. Greenfield, and Theodore Kasemir ("Defendants" or

"Sellers"), respectfully alleges as follows:

## **NATURE OF THE ACTION**

1.      On May 30, 2010, BLRO acquired certain assets of Defendants' Bar Louie restaurant business for a purchase price of approximately $35.8 million.

2.      In connection with the acquisition, BLRO assumed only a narrow set of specifically scheduled liabilities.

3.      BLRO relied on Defendants' representations and warranties, covenants and assurances concerning the assets, liabilities and current and past operations of the business.

4.      BLRO has learned of numerous significant compliance issues concerning Defendants' historical operation of their business, which Defendants failed to disclose during due diligence.

5.      First, BLRO learned that prior to Closing, Defendants failed to pay state and local taxes, creating tax liabilities in the approximate amount of $10 million.  Indeed, Defendants failed to pay sales taxes to the appropriate taxing authorities, despite having collected them from customers.  Defendants also failed to pay various other expenses concerning their pre-Closing liabilities.

6.      Second, BLRO learned that Defendants intentionally mischaracterized and miscoded beverage sales as food sales, in a scheme to avoid the increased costs associated with mandated state liquor licenses based on the actual breakdown of food versus liquor sales.

7.      Third, Defendants also failed to obtain another license material to the operation of the business, despite representing and warranting that it had all licenses necessary to use the purchased assets.

8.     BLRO has paid in excess of $10 million of Defendants' delinquent pre-Closing tax liabilities and other expenses, and has incurred substantial professional fees in connection with same.  BLRO has also spent a significant amount of time and money investigating the extent of Defendants' misconduct and remedying same, so that BLRO could continue to operate its newly acquired business in compliance with law.

9.     BLRO is also faced with an U.S. Equal Employment Opportunity Commission ("EEOC") discrimination charge alleging pre-Closing misconduct by Defendants, including sexual harassment, retaliation, and constructive discharge.

10.     All of these matters for which BLRO has incurred significant expenses, including attorneys' fees, relate to liabilities BLRO did not assume.  BLRO has therefore requested that Defendants reimburse or indemnify BLRO for these expenses, but Defendants have either affirmatively refused to do so or failed to respond.

## PARTIES

11.     Plaintiff BLRO is a business entity organized under the laws of Delaware, with its principal place of business in Texas.

12.     Defendant 701 America, Inc. (F/K/A Bar Louie America, Inc.) is a business entity organized under the laws of Illinois, with its principal place of business in Illinois.

13.     Defendant 706 Development, Inc. (F/K/A Bar Louie Development, Inc.) is a business entity organized under the laws of Illinois, with its principal place of business in Illinois.

14.     Defendant 100 Trademark, Inc. (F/K/A Bar Louie Trademark, Inc.) is a business entity organized under the laws of Illinois, with its principal place of business in Illinois.

15.     Defendant Concepts America, Inc. is a business entity organized under the laws of Illinois, with its principal place of business in Illinois.

16.     Defendant Roger A. Greenfield Revocable Trust is a trust created under the laws of Illinois.

17.     Upon information and belief, Defendant Roger A. Greenfield is an individual residing in Chicago, Illinois.

18.     Upon information and belief, Defendant Theodore Kasemir is an individual residing in Chicago, Illinois.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332, as this is an action between citizens of different states and the amount in controversy, exclusive of interest and costs, exceeds the statutory requirements.

20.     Venue and personal jurisdiction are proper in this judicial district pursuant to 28 U.S.C. § 1391(a) and because the agreements at issue provide that New York is the appropriate forum.

## FACTUAL BACKGROUND

## II.     The Transaction

21.     During the fall of 2009, BLRO and Defendants discussed a transaction involving BLRO's purchase of certain assets of Defendants' Bar Louie restaurant business.  BLRO conducted a due diligence investigation of the business and discovered significant sales and other tax liabilities.

22.     Discovery and quantification of such liabilities by BLRO and its advisors was difficult because of the lack of internal controls, accounting records and policies and compliance policies maintained by Defendants.

23.     As the analysis of the tax liabilities progressed, it became clear that the liability would be measured in the millions of dollars and could involve criminal sanctions, penalties and interest for Defendants.

24.     Defendants had no ability to pay those liabilities through the cash that was available to the Bar Louie business.

25.     In an effort to save the business and the transaction, BLRO proposed a transaction structure that would: (a) permit the sale to BLRO of certain assets of Defendant's Bar Louie restaurant business; and (b) provide for a line of credit upon which Defendants could draw in order to satisfy the tax liabilities (the "Tax Payment Credit Line").

26.     Defendants entered into: (a) an Asset Purchase Agreement dated December 30, 2009 (which, as amended, is referred to herein as the "Asset Purchase Agreement") with BLRO, pursuant to which Defendants agreed to sell to BLRO certain assets of their Bar Louie restaurant business for the approximate amount of $35.8 million (the "Transaction"); and (b) a Credit Agreement dated December 30, 2009 (which, as amended, is referred to herein as the "Credit Agreement") with an affiliate of BLRO, pursuant to which BLRO extended the Tax Payment Credit Line to Defendants.  The Closing of the Transaction took place on May 30, 2010 (the "Closing").

27.     The sale included, among other things, Bar Louie restaurant assets in California, Colorado, Kentucky, Michigan, Missouri, New York, Ohio, Pennsylvania, Virginia, Washington, DC, Wisconsin, Florida and Illinois.

28.     In the Asset Purchase Agreement, the parties identified the assets that would be purchased and specifically enumerated a very narrow set of liabilities that would be assumed by BLRO (the "Assumed Liabilities").

29.     Specifically, pursuant to Section 2.5(b) of the Asset Purchase Agreement, entitled "Assumption of Liabilities," the parties expressly agreed that BLRO would not assume "any Liability that is not specifically identified as an Assumed Liability under Section 2.5(a), (each, an "Unassumed Liability")."

30.     There were only seven types of specifically identified Assumed Liabilities listed on Schedule 2.5(a), none of which are applicable to the claims at issue here.

31.     Because BLRO identified a number of potential issues during due diligence, most notably concerns about Defendants' compliance with tax laws and regulations, BLRO insisted that Defendants make a number of broad representations, warranties and covenants concerning the business.

32.     In Section 4.6 of the Asset Purchase Agreement, entitled "Title to Purchased Assets and Related Matters," the Defendants represented and warranted that they "have good and marketable title to, valid leasehold interests in, or *valid licenses to use all of the Purchased Assets*, free from any Encumbrances except those specified in Section 4.6 of the Disclosure Schedule... (emphasis added)."

33.     In Section 6.3 of the Asset Purchase Agreement, entitled "Satisfaction of Liabilities," Defendants covenanted that, "After the Closing, the Sellers shall (and the other Selling Parties shall cause the Sellers to) satisfy, in accordance with the terms thereof, any and all of their Liabilities that are not Assumed Liabilities."

34.     In Section 6.17 of the Asset Purchase Agreement, entitled "Sales, Use and Other Taxes," Defendants covenanted that, "Between the date hereof and the Closing Date, each Seller shall, and shall cause each Affiliate of each Seller to, timely pay all sales, use, income, franchise and other Taxes owed by it to any applicable Governmental Body."

35.     In Section 6.18 of the Asset Purchase Agreement, entitled "Compliance with Laws," Defendants covenanted that, "Between the date hereof and the Closing Date, the Selling Parties shall cause each of their Affiliates to, comply in all material respect[s] with the requirements of applicable Laws and all Court Orders applicable to them or the Business."

36.     The parties also set forth specific indemnity rights arising out of Defendants' breaches of their representations and covenants.

37.     Specifically, pursuant to Section 10.1, entitled "Indemnification...By the Selling Parties," Defendants agreed that:

> "[Defendants] jointly and severally, shall indemnify, defend and hold harmless the Buyer...from and against any Liabilities, claims, demands, judgments, losses, costs, damages, or expenses whatsoever (including reasonable attorneys', consultants' and other professional fees and disbursements of every kind, nature and description incurred by such Indemnified Buyer Party in connection therewith including consequential and punitive damages) (collectively, "Damages") that such Indemnified Buyer Party may sustain, suffer, or incur and that result from, arise out of, or relate to:
>
> (a)     any breach of any of the covenants or agreements of the Selling Parties contained in this Agreement or in the Closing Certificates...

(c)     any Unassumed Liability, regardless of whether or not the Disclosure Schedule discloses any such Unassumed Liability...

(d)     any Liabilities for (i) Taxes relating to the Business or the Purchased Assets for all taxable periods ending on or prior to the Closing Date and any portion of such period that begins before and ends after the Closing Date attributable to the portion of such period ending on the Closing Date (the "Pre-Closing Tax Period") (whether or not such Taxes have been due and payable), (ii) Taxes of the Sellers or any Affiliate of the Sellers and any and all Taxes of any Person imposed on the Buyer or any of its Affiliates as a transferee or successor of the Sellers, by Contract or pursuant to any Law, which Taxes relate to an event or transaction first occurring before the Closing Date...

(e)     any Liability arising out of or related to the actual or constructive termination of any employee... [and]

(k)     any breach of any Fundamental Representations...

38.     However, the indemnity provisions are not BLRO's exclusive remedy. Specifically, Section 13, entitled "Remedies," provides that, "The indemnification rights under Section 10 *are independent of and in addition to such rights and remedies as the Parties may have at Contract or in equity* or otherwise for any misrepresentation, breach of warranty, or failure to fulfill any agreement or covenant hereunder on the part of any Party, including the right to seek specific performance, rescission, or restitution, none of which rights or remedies shall be affected or diminished by Section 10." (emphasis added).

39.     Indeed, BLRO specifically preserved its right to assert, outside the scope of the process set up by the parties for indemnity claims, independent breach of contract claims for any breaches of the provisions of the Asset Purchase Agreement.

40.     Accordingly, Defendants' improper conduct described below gives rise to both causes of action for breach of contract and for indemnity.

**III.** **Defendants' Wrongful Conduct in Connection with the Asset Purchase Agreement**

    **A.** **Defendants' Failure to Pay Pre-Closing Sales Taxes and Other Expenses in Violation of Law and the Asset Purchase Agreement**

        **1.** **Defendants' Failure to Pay Pre-Closing Tax Liabilities**

41.    During due diligence, BLRO discovered that Defendants had been noncompliant with the tax laws for a substantial amount of time.

42.    Among other issues, Defendants collected sales tax for food and beverage consumption at their various restaurants, but they declined to pay those taxes over to the appropriate taxing authorities, in direct contravention of the applicable state and local tax laws and regulations, many of which provide for criminal sanctions, penalties and interest.

43.    BLRO informed Defendants that BLRO could not move forward with the Transaction unless the Defendants approached the relevant states, voluntarily disclosed the failure to pay taxes, and paid all amounts due and owing.

44.    Upon learning that Defendants were unable to pay those tax liabilities and therefore unable to move forward with the Transaction, an affiliate of BLRO agreed to provide Defendants with a secured line of credit, pursuant to the terms of the Credit Agreement, to be used for funding payment of those delinquent tax liabilities.

45.    At BLRO's insistence, Defendants entered into Voluntary Disclosure Agreements and other arrangements ("VDAs") with the following states: California, Colorado, Kentucky, Michigan, New York, Ohio, Pennsylvania, Virginia, Wisconsin, Florida and Illinois, pursuant to which Defendants agreed to pay all delinquent sales tax obligations in exchange for a release from civil and criminal liability.

46.     In evaluating the final purchase price, the parties estimated the liabilities Defendants owed in delinquent tax obligations pursuant to those VDAs and provided a mechanism in the Asset Purchase Agreement to compensate BLRO for any inaccuracies in such estimates.  The actual amount of Defendants' tax liabilities has proven greater than those estimates.

47.     The parties estimated those tax liabilities to be approximately $10.4 million.

48.     BLRO has already paid taxes in excess of the parties' estimates in the approximate amount of $1 million.

49.     This amount includes payments BLRO made for Defendants' additional delinquent pre-Closing tax liabilities incurred outside the scope of the VDAs, including without limitation:

    a.     Other sales and use taxes in the amount of $498,671;

    b.     Other income taxes in the amount of $19,876;

    c.     Tax assessments from the City of Chicago in the amount of $89,170;

    d.     Ohio CAT taxes in the amount of $48,246;

    e.     May sales tax paid by BLRO in excess of the parties' estimate in the amount of $10,237; and

    f.     Miscellaneous other pre-Closing taxes, including without limitation real estate taxes in the amount of $46,348, and personal property taxes in the amount of $111,197.

50.     Post-Closing, BLRO has also incurred and continues to incur a substantial amount of professional fees to resolve the many tax issues created by Defendants' misconduct, to date in the amount of $456,188.

### 2.    Defendants' Failure to Pay Pre-Closing Expenses

51.     Additionally, post-Closing, BLRO has paid four different types of expenses that arise from the pre-Closing obligations of Defendants and for which Defendants retained responsibility pursuant to the Asset Purchase Agreement.

52.     First, BLRO paid direct capital lease payments in the amount of $9,070.  BLRO also paid a direct capital lease settlement payment in the amount of $14,000.

53.     Second, BLRO paid invoices for pre-Closing expenses in the amount of $226,738, including those that were not included in the Accounts Payable assumed by BLRO and identified at Schedule 2.5(a) of the Asset Purchase Agreement.

54.     Third, for a short time post-Closing, BLRO and Defendants shared a corporate headquarters at Pickwick Ave in Glenview, Illinois, where Defendants acted as landlord and BLRO as tenant.

55.     In exchange for rent relief in an agreed upon amount for rent BLRO would have owed to Defendants, BLRO agreed to pay certain expenses that were the Defendants' obligations.  However, the expenses BLRO paid on Defendants' behalf exceeded the parties' agreement by $6,145.  Such amounts are required to be reimbursed by Defendants to BLRO.

56.     Fourth, BLRO has paid and continues to incur other expenses arising from Defendants' pre-Closing failure to pay rent and/or property taxes.  Indeed, BLRO has already paid the amount of $13,472 and has received $45,451 in additional charges.

### 3.    Defendants Breached their Covenants and Indemnity Obligations

57.    Defendants' pre-Closing tax liabilities were specifically defined in Section 2.5(b) of the Asset Purchase Agreement as Unassumed Liabilities for which BLRO is not responsible: "any Liability that is not specifically identified as an Assumed Liability under Section 2.5(a) (each, an "Unassumed Liability"), including all of the following... (iii) all Liabilities for (A) Taxes relating to the Business or the Purchased Assets for any Pre-Closing Period and (B) Taxes of the Sellers or any Affiliate of the Sellers...."

58.    Defendants' pre-Closing expenses are also Unassumed Liabilities for which Defendants are responsible because they were not specifically identified as Assumed Liabilities in Schedule 2.5(a).

59.    Pursuant to Sections 6.3, 6.17 and 6.18 of the Asset Purchase Agreement, discussed above at Section II(A), Defendants covenanted that they would satisfy all Unassumed Liabilities, pay all taxes owed as of the Closing date and cause the business to comply with all laws, including tax laws and regulations.

60.    Defendants' failure to pay the taxes and other expenses discussed above constitutes a material breach of their Covenants at Sections 6.3, 6.17 and 6.18 of the Asset Purchase Agreement.  BLRO is entitled to damages, including consequential damages, as a result of that breach.

61.    In the alternative, BLRO is entitled to indemnity pursuant to Sections 10.1(a), (c) and (d) of the Asset Purchase Agreement, which provide that BLRO is entitled to Damages for: (a) any breach of any of the covenants or agreements of the Selling Parties...; (c) any Unassumed Liability...; and (d) any Liabilities for pre-Closing tax obligations.

### 4.   Defendants' Failure to Respond to BLRO's Claim Notice

62.    Pursuant to Section 10.3 of the Asset Purchase Agreement, entitled "Claims Period," on April 14, 2011, BLRO sent Defendants a claim notice seeking indemnity for all of the tax liabilities and expenses discussed above (the "April 14, 2011 Claim Notice").

63.    Specifically, at Defendants' counsel's request, BLRO emailed Defendants' counsel a detailed spreadsheet explaining the nature of the above the claims as well as the amounts thereof.  The spreadsheet compared the estimated pre-Closing liabilities relied on in arriving at the purchase price at Closing with the actual payments BLRO made post-Closing for Defendants' pre-Closing liabilities and expenses.

64.    In the April 14, 2011 Claim Notice, BLRO advised Defendants' counsel that BLRO had already paid $1,849,476 for these pre-Closing tax liabilities, expenses and associated professional fees.  This amount continues to grow.

65.    On two occasions, first on May 16, 2011 and again on May 23, 2011, counsel for BLRO contacted Defendants' counsel requesting a response to BLRO's April 14, 2011 Claim Notice.

66.    Defendants did not respond, and have not responded as of the date of filing of this Complaint, 147 days later.

67.    Section 10.3 of the Asset Purchase Agreement provides that "If any Indemnitor fails to give a Claim Response within the Response Period [30 calendar days], then such Indemnitor shall be deemed not to dispute the claim described in the related Claim Notice.  If any Indemnitor elects not to dispute a claim described in a Claim Notice, whether by failing to

give a timely Claim Response in accordance hereof or otherwise, then the amount of such claim shall be conclusively deemed to be an obligation of such Indemnitor."

68.     As a result of Defendants' failure to respond to BLRO's Claim Notice as required by Section 10.3, BLRO is entitled to Damages in the amount of $1,849,476, which amount is deemed "conclusively" determined under Section 10.3 of the Asset Purchase Agreement.

69.     BLRO is also entitled to a declaration that it is entitled on an on-going basis to Damages as they are incurred and as expenses are paid with respect to all matters set forth in the April 14, 2011 Claim Notice.

**B.      Defendants' Failure to Obtain Appropriate Licenses**

70.     As a result of the tax issues identified during due diligence, BLRO went to great lengths to obtain assurances from Defendants that the Bar Louie business was otherwise in compliance with law.  BLRO also conducted other due diligence in an effort to uncover any additional non-tax noncompliance with law, including due diligence concerning licensing issues affecting the valuation and operation of the business.

71.     Throughout due diligence and deal negotiations, Defendants assured BLRO of their compliance and memorialized those assurances in the representations, warranties and covenants sections of the Asset Purchase Agreement.

72.     In Section 4.6 of the Asset Purchase Agreement, entitled "Title to Purchased Assets and Related Matters," the Defendants represented and warranted that they "have good and marketable title to, valid leasehold interests in, or *valid licenses to use all of the Purchased*

*Assets*, free from any Encumbrances except those specified in Section 4.6 of the Disclosure Schedule..." (emphasis added).

73.    In Section 6.3 of the Asset Purchase Agreement, entitled "<u>Satisfaction of Liabilities,</u>" Defendants covenanted that "After the Closing, the Sellers shall (and the other Selling Parties shall cause the Sellers to) satisfy, in accordance with the terms thereof, any and all of their Liabilities that are not Assumed Liabilities."

74.    In Section 6.18 of the Asset Purchase Agreement, entitled "<u>Compliance with Laws,</u>" Defendants covenanted that "Between the date hereof and the Closing Date, the Selling Parties shall cause each of their Affiliates to, comply in all material respect[s] with the requirements of applicable Laws and all Court Orders applicable to them or the Business."

75.    Since the Closing, BLRO has learned that these representations, warranties and covenants were false, and that Defendants' did not have the appropriate: (1) liquor licenses at certain restaurants; or (2) American Society of Composers, Authors and Publishers ("ASCAP") license.

### 1.    Defendants' Conduct to Avoid Mandated State Liquor Licenses

76.    Post-Closing, BLRO discovered that at restaurants located in Boynton Beach, FL and Orlando, FL, Defendants had intentionally and systematically mischaracterized certain alcoholic beverage sales as food sales, in clear contravention of law, to avoid the costs associated with mandated, more expensive state liquor licenses.

77.    As a result of Defendants' mischaracterizations, the state liquor licenses for the restaurants located in Boynton Beach and Orlando, FL, and the Defendants' operation of those

restaurants under those state liquor licenses, failed to comply with applicable law prior to and as of the Closing.

78.     BLRO has already paid $372,922 to obtain the appropriate liquor licenses, and BLRO could continue to incur additional expenses.  BLRO has also incurred and continues to incur a significant amount of attorneys' and other professional fees in connection with this issue.

### 2.     Defendants' Failure to Have the Appropriate ASCAP License

79.     ASCAP sells companies, like bars and restaurants, a license to entertain their customers, guests and employees with music.  With one license fee, ASCAP saves companies the time, expense, and burden of contacting thousands of copyright owners for a license to play their music.

80.     BLRO learned that certain Bar Louie Restaurants held live music and D.J. performances without having the appropriate ASCAP license, which would have allowed for those performances.

81.     BLRO has already paid $39,000 to obtain the appropriate ASCAP license, and BLRO could continue to incur additional expenses.  BLRO has also incurred and continues to incur a significant amount of attorneys' and other professional fees in connection with this issue.

### 3.     Defendants' Breach of their Covenants and Indemnity Obligations

82.     On October 4, 2010, BLRO notified Defendants of its claims concerning Defendants' failure to have the appropriate liquor and ASCAP licenses and requested indemnity from Defendants.  On October 26, 2010, Defendants rejected those requests.

83.     The amounts paid by BLRO to secure the appropriate liquor and ASCAP license provisions are Unassumed Liabilities for which Defendants are responsible pursuant to Section 2.5 of the Asset Purchase Agreement.

84.     Pursuant to Sections 6.3 and 6.18 of the Asset Purchase Agreement, Defendants covenanted that they would satisfy all Unassumed Liabilities and that they would cause the business to comply with all laws.

85.     Defendants' failure to have the appropriate liquor and ASCAP licenses constitutes breaches of their covenants at Sections 6.3 and 6.18 of the Asset Purchase Agreement.  BLRO is entitled to damages, including consequential damages as a result of that breach.

86.     In the alternative, BLRO is entitled to indemnity pursuant to Sections 10.1(a), (c) and (k) of the Asset Purchase Agreement, which provide that BLRO is entitled to Damages for: "(a) any breach of any of the covenants or agreements of the Selling Parties ...; (c) any Unassumed Liability....[and]; (k) any breach of any Fundamental Representations [including Section 4.6]."

**C.      Defendants' Failure to Defend and Indemnify BLRO for the EEOC Claim**

87.     On September 22, 2010, Sun Capital Partners V ("SCPV"), which was not a party to the Transaction, received a Charge of Discrimination filed by LaKisha Drakes with the EEOC in Pittsburgh, Pennsylvania (Charge No. 533-2010-0127).  SCPV is an Affiliate of BRLO.

88.     Ms. Drakes alleges that pre-Closing, she endured sexual harassment, discrimination, retaliation and constructive discharge at one of Defendants' restaurants.

89.     Specifically, she alleges that she was harassed based on her race and gender, that she was discriminated against based on her race, and that she was retaliated against for complaining and reporting the misconduct.  She therefore claims to have been constructively discharged on May 3, 2010, less than one month prior to the Closing date under the Asset Purchase Agreement.

90.     All of the unlawful conduct was alleged to have occurred before the Closing date; therefore, the Damages arising therefrom are Unassumed Liabilities for which Defendants are responsible.

91.     Indeed, at Section 7.2(c) of the Asset Purchase Agreement, entitled "Employees," Defendants covenanted that, "Any and all Liabilities relating to or arising out of the employment, or cessation of employment, of any Seller Employee (whether or not a Transferred Employee) on or prior to the close of business on the Closing Date shall be the sole responsibility of the Sellers including wages and other remuneration due through the close of business on the Closing Date."

92.     Accordingly, SCVP filed a position statement with the EEOC on October 25, 2010 explaining that SCVP does not have any liability in connection with these events, which arose exclusively prior to the Closing of the Transaction, to which SCVP was not even a party.

93.     Pursuant to Section 10.5 of the Asset Purchase Agreement, on October 18, 2010, BLRO sent a claim notice requesting that Defendants assume the defense of this third party action and that they take all necessary steps to have the Charge of Discrimination amended to reflect Ms. Drakes' actual employer at the time of the misconduct.

94.    Defendants did not respond.  However, upon information and belief, Defendants recently filed an answer to the charge of discrimination with the EEOC.

95.    In the event BLRO incurs expenses in connection with the EEOC matter, BLRO is entitled to indemnity pursuant to Sections 10.1(a), (c) and (e) of the Asset Purchase Agreement, which provide that BLRO is entitled to Damages for:  "(a) any breach of any of the covenants or agreements of the Selling Parties...; (c) any Unassumed Liability....[and]; (e) any Liability arising out of or related to the actual or constructive termination of any employee..."

96.    As set forth above, Section 10.3 of the Asset Purchase Agreement provides that "If any Indemnitor fails to give a Claim Response within the Response Period, then such Indemnitor shall be deemed not to dispute the claim described in the related Claim Notice.  If any Indemnitor elects not to dispute a claim described in a Claim Notice, whether by failing to give a timely Claim Response in accordance hereof or otherwise, then the amount of such claim shall be conclusively deemed to be an obligation of such Indemnitor."

97.    As a result of Defendants' failure to respond to BLRO's Claim Notice as required by Section 10.3, BLRO is entitled to a declaration that BLRO is entitled on an on-going basis to Damages and expenses as they are incurred, including attorneys' fees arising out the EEOC action.

IV.    **Defendants' Breaches of the Transition Services Agreement**

98.    The parties also executed a Transition Services Agreement on May 30, 2010, which sets forth the parties' obligations and entitlements to certain transition services with respect to the post-Closing operation of their respective businesses.

99.     The parties specifically agreed at Section 4.4, entitled "<u>No Additional Access to Personnel or Assets,</u>" that, "Except as specifically identified as Transition Services on Exhibit A, neither the Seller nor any of its Affiliates shall have any access to or authority over any of Buyer's personnel, assets, services or functions.  Without limiting the foregoing or any other remedies available to Buyer, if Seller or any of its Affiliates uses or accesses any of Buyer's personnel, assets, services or functions (...), Seller shall pay to Buyer a fee equal to Buyer's calculation of the cost of such personnel, assets, services or functions based on the amount of Seller's use thereof."

100.     After the Closing Date, Defendant Kasemir directed certain employees of BLRO, including personnel in BLRO's human resources and information technology departments, to perform certain services for a non-Bar Louie business.

101.     On October 4, 2010, BLRO notified Defendants of this issue and requested payment from Defendants in excess of $9,000.  Defendants rejected this request.

102.     BLRO is entitled to be compensated for these amounts pursuant to the Transition Services Agreement.

**V.     <u>Setoff</u>**

103.     Pursuant to Section 13 of the Asset Purchase Agreement, the parties acknowledged that BLRO, "shall have the right to setoff against any amounts owing to the Sellers by the Buyer... the full amount of any amounts owing or alleged to be owing from the Sellers to the Buyer."

104.     Pursuant to Section 10.8(a) of the Closing Agreement and Amendment No. 1 to Asset Purchase Agreement dated May 30, 2010, the parties acknowledged that, "In

addition to, and not in limitation of, any other rights set forth in this Agreement (including under Section 13), the Promissory Note shall be subject to a right of set-off in respect of any amounts payable (the "Claim Amount") by the Selling Parties pursuant to this Agreement, including under Section 2.6 and Section 10.  In the event that any such Claim Amount exists, then the Buyer and/or BL Restaurant Holding, LLC (the "Note Issuer") shall be entitled to offset against any amount payable pursuant to the Promissory Note an amount equal to three times the Claim Amount."

105.   Pursuant to Section 4 of the Subordinated Promissory Note dated May 30, 2010, entitled "Indemnification and Setoff," the parties agreed that, "Notwithstanding anything to the contrary set forth herein, any Vested Amounts owing under this Note and any interest accrued and payable with respect thereto are subject to the right of the Buyer (or any successor assignee of the Buyer) and its Affiliates to indemnification and setoff as set forth in Sections 10 and 13 of the Asset Purchase Agreement…"

106.   BLRO is entitled to setoff any amounts recovered in connection with this action against any amounts owing to the Defendants by BLRO, including amounts owed to Defendants under the Promissory Note, warrants or otherwise.

### COUNT I
**(Breach of Contract/Covenants - Asset Purchase Agreement)**

107.   BLRO repeats and realleges each and every allegation contained in paragraphs 1 through 106 above.

108.   On or about December 30, 2009, BLRO and Defendants entered into the Asset Purchase Agreement.

109.   The Asset Purchase Agreement is a valid and enforceable agreement between BLRO and Defendants.

110.   BLRO has complied with its obligations under the Asset Purchase Agreement.

111.   As set forth above in paragraphs 21-86 above, Defendants have materially breached the Covenants in the Asset Purchase Agreement, including specifically Sections 6.3, 6.17, and 6.18.

112.   As a direct and proximate result of Defendants' breaches of the Asset Purchase Agreement, BLRO has incurred and will continue to incur Damages, including consequential damages in the form of attorneys' and other professional fees, in a total amount to be established at trial.

113.   In accordance with the terms of the Asset Purchase Agreement, BLRO is entitled to a judgment requiring Defendants to reimburse it for all Damages incurred in connection with the foregoing matters.

## COUNT II
### (Breach of Indemnity Obligations - Asset Purchase Agreement)

114.   BLRO repeats and realleges each and every allegation contained in paragraphs 1 through 113 above.

115.   On or about December 30, 2009, BLRO and Defendants entered into the Asset Purchase Agreement.

116.   The Asset Purchase Agreement is a valid and enforceable agreement between BLRO and Defendants.

117.   BLRO has complied with its obligations under the Asset Purchase Agreement.

118.    As set forth above in paragraphs 21-86 above, Defendants have materially breached the Asset Purchase Agreement by failing and refusing to defend, indemnify and hold harmless BLRO from and against the Damages (as defined in the Asset Purchase Agreement) arising out of Defendants' breaches of the Asset Purchase Agreement, including their breaches of Sections 2.5, 4.6, 6.3, 6.17, 6.18, and 10.1(a), (c), (d) and (k).

119.    As a direct and proximate result of Defendants' breaches of the Asset Purchase Agreement and failure and refusal to indemnify under the Asset Purchase Agreement, BLRO has incurred and will continue to incur Damages, in a total amount to be established at trial.

120.    In accordance with the terms of the Asset Purchase Agreement, BLRO is entitled to a judgment requiring Defendants to indemnify and hold it harmless from, and to reimburse it for, all Damages incurred in connection with the foregoing matters.

## COUNT III
### (Declaratory Judgment)

121.    BLRO repeats and realleges each and every allegation contained in paragraphs 1 through 120 above.

122.    As set forth above in paragraphs 21-97 above, certain of the matters alleged herein involve Damages that are, at present, uncertain in amount and are dependent on: (a) whether BLRO receives future tax assessments and incurs other reimbursable expenses; (b) whether BLRO incurs additional expenses in connection with deficient liquor and/or ASCAP licenses; and (c) the outcome of the EEOC claim identified above.

123.    The matters set forth above are ripe for a determination by the Court because Defendants have either expressly refused to indemnify, defend and hold harmless BLRO from

and against, and to reimburse BLRO with respect to all Damages relating to their breaches of the Asset Purchase Agreement, including their breaches of Sections 2.5, 4.6, 6.3, 6.17, 6.18, 7.2(a), and 10.1(a), (c), (d), (e) and (k), or Defendants have failed to respond to BLRO's requests to address such matters.

124.    Declaratory relief is proper because there is a substantial controversy between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of declaratory judgment.

125.    BLRO has no adequate remedy at law.

126.    Therefore, BLRO is entitled to a judgment declaring that Defendants are required to indemnify and hold BLRO harmless and reimburse BLRO for all Damages, including consequential damages, arising out of or related to the matters alleged above, including, without limitation, a judgment obligating Defendants to reimburse BLRO for all Damages as and when such Damages are incurred and paid in connection with the foregoing matters.

## COUNT IV
### (Breach of Contract - Transition Services Agreement)

127.    BLRO repeats and realleges each and every allegation contained in paragraphs 1 through 126 above.

128.    On or about May 30, 2010, BLRO and Defendants entered into the Transition Services Agreement.

129.    The Transition Services Agreement is a valid and enforceable agreement between BLRO and Defendants.

130.    BLRO has complied with its obligations under the Transition Services Agreement.

131.    As set forth in paragraphs 98-102 above, Defendants have materially breached the requirements of Section 4.4 of the Transition Services Agreement.

132.    As a direct and proximate result of Defendants' breach of the Transition Services Agreement, BLRO has incurred and will continue to incur Damages, in a total amount to be established at trial.

133.    In accordance with the terms of the Transition Services Agreement, BLRO is entitled to a judgment requiring Defendants to reimburse it for, all Damages incurred in connection with the foregoing matters.

## PRAYER FOR RELIEF

WHEREFORE, BLRO respectfully requests that this Court award it compensatory and consequential damages in an amount in excess of $75,000, plus costs, attorneys' fees, and interest in an amount to be determined at trial and such other relief as may be warranted; and

WHEREFORE, BLRO respectfully requests that this Court enter a declaratory judgment in favor of BLRO on its Third Cause of Action pursuant to 28 U.S.C. §2201 and Rule 57 of the Federal Rules of Civil Procedure, and order Defendants to indemnify or reimburse BLRO on an on-going basis, as Damages are incurred and expenses are paid, with respect to all matters for which Damages have not yet been incurred, plus costs, attorneys' fees and interest.

DATED:      New York, New York

September 8, 2011

MORGAN, LEWIS & BOCKIUS LLP

Margot G. Bloom (MB-7455)
Attorneys for Plaintiff
101 Park Avenue
New York, NY 10178-0061
Telephone: (215) 963-5122
Fax: (215) 963-5000

OF COUNSEL:
Troy S. Brown
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19102
Telephone: (215) 963-5214
Fax: (215) 963-5000